Estate of Charles F. Haley, Deceased v. Commissioner.
Estate of Charles F. Haley v. Commissioner
Docket No. 24348.
United States Tax Court
1951 Tax Ct. Memo LEXIS 146; 10 T.C.M. (CCH) 805; T.C.M. (RIA) 51244; August 9, 1951
R. B. Reavill, Esq., and Joseph B. Johnson, Esq., for the petitioner. Thomas A. Steele, Jr., Esq., for the respondent. JOHNSON Memorandum Findings of Fact and Opinion JOHNSON, Judge: This proceeding involves a deficiency of $129,428.88 in estate tax. The sole question for our consideration is whether three certain transfers were made by the decedent in contemplation of death within the meaning of section 811 (c) (1) (A) of the Internal Revenue Code. The parties have agreed that certain administration expenses and attorneys' fees shall be determined upon hearing under Rule 50. All other adjustments made by the Commissioner in the deficiency notice are conceded to be correct by the petitioner. Findings of *147 Fact The stipulation of facts is adopted and incorporated herein by this reference. From it, oral testimony and documentary evidence, we find: Charles F. Haley, hereinafter called decedent, died testate on May 14, 1945, a resident of Miami Beach, Florida, at the age of 78 years, having been born November 15, 1866. The County Judge's Court of Dade County, Florida, issued letters of administration with the will annexed to Katherine Haley Fuller, decedent's daughter, who thereupon qualified and served as such. She filed with the collector of internal revenue for the district of Florida a Federal estate tax return, disclosing a returned gross estate valued, as of date of decedent's death, at $712,608.25, and a net Federal estate tax liability of $148,070.44, which sum was paid. The Commissioner in his deficiency notice, among other adjustments, increased the net value of the estate by including therein the sum of $389,196.20, being the aggregate value of three transfers of inter vivos gifts made by decedent primarily to his daughter, Katherine Haley Fuller, which the Commissioner determined were made by decedent in contemplation of death within the meaning of section 811 (c) of the Internal Revenue Code *148 . The transfers so made by decedent were as follows: (1) Transfer in trust on May 31, 1937, "for the benefit of his daughter and grandchildren" of corporate stock, being principally 450 shares of A. D. Thomson and Company. The value of the property at date of transfer was $96,750. Its value at decedent's death was $131,231.85. (2) Outright gift, on July 5, 1938, to Katherine Haley Fuller of 400 shares 7 per cent preferred stock U.S. Steel and 300 shares 6 per cent preferred stock Kelley How Thomson Company. The value of this gift when made was $63,100, and at decedent's death its value was $88,750. (3) Transfer in trust on April 25, 1939, "for the benefit of his daughter, Katherine Haley Fuller, and her children" of certain shares of the capital stock of various corporations. The aggregate value of same at the date of transfer was $126,494.75, and at decedent's death its value was $169,214.35. Upon each of the dates decedent executed the three above transfers, his net worth was approximately one million dollars. Decedent was twice married. His first wife died in 1921. By her he had two children, a son, Charles F., Jr., and a daughter, Katherine, they being decedent's only *149 children. Decedent had a deep affection for both of his children. In 1934 his son died of a self-inflicted gunshot wound. The wife of decedent's son had left him, and the tragedy was caused by the son's attempt to inflict a superficial wound in the desperate hope of winning back his wife. Decedent's reaction to the shock of his son's death was one of extreme disaffection for his daughter-in-law, and he became completely estranged from her and her children. From that time on decedent made no provision for his daughter-in-law or her children, directly or indirectly, either in his dispositions of his property by inter vivos gifts and/or trusts and/or by will. At the time that decedent's son killed himself, besides his widow, the son left surviving him three children - Mary, age 9; Beatrice, age 8; Nancy, age 3. The widow, who has since remarried, and the three children are alive at the present time. Decedent's son left an estate of approximately $165,000, the greater part of which had been given to him by decedent. Prior to the death of his son in 1934, decedent had made gifts to his daughter, Katherine Haley Fuller, which in 1937 had a value in excess of $140,000. Katherine was *150 fifteen or sixteen years old when her mother died, and after completing her education she became the mistress of her father's house. Decedent was then a resident of Duluth, Minnesota, where he spent most of his life and, until his son's death, maintained a large home, lived luxuriously, kept many servants and entertained quite a bit. He was fond of motoring and he and Katherine took motor trips together and they were very congenial, she being the apple of his eye. Upon her graduation he gave her an expensive, specially built automobile. In June, 1932, Katherine married C. E. Fuller, Jr., and they had two children whose ages in October, 1950, were seventeen and sixteen. Fuller, a man of limited means, was unemployed when he married Katherine, whereupon he went to work for a grain company in which decedent was an officer and stockholder at a salary of $150 a month and later for another grain company at $250 a month. In 1937 Fuller invested $40,000 in the Fuller Grain Company, and on January 1, 1945, became a partner in Thomson & McKinnon, investing $100,000 therein which he borrowed from decedent. Fuller has never accumulated substantial assets of his own. In 1933 the Fullers purchased *151 an expensive home in Duluth. Decedent, in 1934, after his son's death, made his home with the Fullers until his marriage in 1937. The Fullers maintained a high scale of living during this period, as decedent desired that they should, and they often accompanied him to Florida during the winter. Decedent at various times made substantial gifts to the Fullers in helping them defray their expenses, as he wanted his daughter to live in luxury as she had before her marriage. On December 1, 1936, decedent gave an account receivable, valued on said date at $15,000, to his son-in-law, Charles E. Fuller, Jr., and on August 20, 1939, gave his son-in-law 110 shares of the common stock of Andresen-Ryan Coffee Company of Duluth, Minnesota, having a value of $6,600. After decedent moved to Florida, the Fullers visited him and on two of such visits decedent gave the Fullers sums in excess of $6,000. On December 27, 1937, decedent, then 71 years old, married Mrs. Ivy H. Eklund, 44 years of age. She was a widow with four grown children. Their courtship began in 1934, but was not disclosed to decedent's daughter until April, 1937, at which time plans were matured for a marriage the coming winter. Prior *152 to the marriage, upon proposal by decedent, Mrs. Eklund agreed to accept a marriage settlement of $100,000. At the time, decedent told her that he was worth $300,000, while in fact he was then worth approximately one million dollars. The antenuptial agreement was executed by decedent and Mrs. Eklund on December 27, 1937, the morning of their marriage, and on the same date decedent executed a new will and Mrs. Eklund signed her consent to the terms thereof, knowing that she would not get anything under the terms of the will, Katherine being the principal beneficiary therein. Decedent told Mrs. Eklund he was 65 years old, and she believed that to be his age, as he did not look older than that. In January, 1938, decedent and his new wife transferred their residence to Miami Beach, Florida, and that year he purchased a homestead in Miami Beach, which was valued in the estate tax return at $30,000. On August 31, 1939, decedent and wife Ivy deeded the homestead in Miami Beach to decedent's daughter Katherine, reserving a life estate therein to decedent and his wife. Ivy was reluctant to do this, but did so upon decedent's insistence. On August 31, 1939, decedent and his wife Ivy executed *153 an agreement, establishing a trust in favor of Ivy in the amount of $100,000, being executed in compliance with the prenuptial agreement. On the same date Ivy executed in favor of decedent a deed of release to all property, both real and personal, and also her dower rights and all rights of any kind in and to any property belonging to decedent. On the same date decedent executed another will, wherein he left Ivy certain furniture, furnishing, jewelry, automobiles, etc., $10,000 to the Catholic church and the residue of his estate to Katherine. Ivy contemporaneously executed consent in writing to the terms of the will. On September 26, 1944, decedent executed a codicil to this will so that the property Katherine received under the will would be held in trust for her by a Duluth bank. Decedent was in the grain and brokerage business. In his early years he was grain inspector and then chief grain inspector of Duluth. Prior to 1921, and until the company was finally liquidated in 1939, he was vice president and general manager of A. D. Thomson & Company, one of the largest grain companies on the Duluth Board of Trade, having charge of the operation of their grain terminal elevator, sales, *154 merchandising and purchasing of grain. In July, 1937, A. D. Thomson & Company decided to liquidate, and the liquidation took place in 1937, 1938 and 1939. For income tax purposes decedent had a basis of $100 per share for his A. D. Thomson & Company stock. Final liquidation was for an amount in excess of $225 per share. At the time of liquidation decedent owned 3,300 shares, having transferred 450 shares to the trust for Katherine. In 1934 decedent became a general partner in the firmof Thomson & McKinnon, one of the largest brokerage firms in the United States, and at that time became its resident partner in Duluth. He made an original capital investment of $200,000 in this partnership. After the discontinuance of the business of A. D. Thomson & Company in 1937, decedent became known as the resident partner in Florida of Thomson & McKinnon, having supervision over seven or eight offices of the company in Florida. After moving to Florida in 1938, decedent became more active in the policy-making of this company, becoming a member of its executive committee, and in January, 1939, he increased his capital investment to $300,000. Prior to moving to Florida decedent was also a director *155 of Northern National Bank of Duluth and of Andresen-Ryan Coffee Company of Duluth. He also owned stocks in a number of other corporations. He carried only a small amount of life insurance, Katherine being the beneficiary therein. In 1935 decedent purchased an annuity for the sum of $106,890 from Northwestern Mutual Life Insurance Company of Milwaukee, which paid him $10,000 a year for life. He expected to make a profit on the annuity, stating, "Well, if I live to be eighty-five I will be ahead by a considerable amount." For many years decedent was a trader in commodity futures, principally grain futures for his own account, being known as the largest speculator on the Duluth Board of Trade, and speculating in various commodity markets in this country and Canada. For the years 1930 through 1939 his losses substantially exceeded his gains in such speculations. Because of hazards of his stock market operations, decedent expressed concern about the future financial welfare of Katherine. George Kreager became associated with A. D. Thomson & Company in 1921, and was the sole tax adviser of decedent and others in that corporation from 1928 to decedent's death. Before decedent made each *156 of the three transfers in question, he talked with Kreager, especially with reference to the effect the transfers would have upon decedent's personal income tax, and in each instance was told that the result would be a reduction of his personal income tax, and reasons were given therefor, and such transfers did so result. Kreager recommended all of the transfers, and as to the 1937 trust, due to the imminence of liquidation of Thomson & Company and the low cost basis of decedent's stock therein, Kreager suggested that the trust should include 900 shares instead of 450. The 1937 and 1939 trusts were both irrevocable gifts, and no benefit contingent or otherwise, was retained by decedent. They both provided for fixed annuity payments to Katherine, beginning immediately, the annuities in the 1937 trust being $1,200 until January 1, 1942, and $4,800 a year thereafter, and the 1939 trust was for $4,800 annually. Prior to a stroke suffered by decedent in March, 1942, he appeared to be in perfect health and had a zest for living. He had the appearance of a man younger in years and was mentally alert. He never visited doctors and would say, "Why go to a doctor when you are feeling alright? *157 " He loved life and apparently thought he was going to live for a long time. After his second marriage, and while living in Florida, he joined a country club and played golf. After his stroke he was not quite as mentally alert as before, but continued to actively participate in business until his death. None of the three transfers in question was executed by decedent in contemplation of death. Among the reasons prompting him to make same were: (1) To assure his daughter and her family a scale of living which he desired them to maintain during his own lifetime; (2) to reduce his own income taxes, and (3) to secure his daughter's income from the risks of his own market speculations. Opinion Were the three gifts of decedent to his daughter in 1937, 1938 and 1939, approximately eight, seven and six years prior to his death, made by him "in contemplation of death"? We do not think so and have so found. We deem it unnecessary to recite the evidence upon which this conclusion is based, which is contained in our findings of fact. Suffice it to say that the record as a whole clearly refutes the respondent's determination that such gifts were made by decedent in contemplation of death *158 within the meaning of section 811(c) of the Code. Contemplation of death as here used has been interpreted as meaning "the impelling cause" of the transfer or gift. United States v. Wells, 283 U.S. 102. The age of decedent when these gifts were made ranged from seventy to seventy-three years, but he was well preserved physically and mentally, perfect in health and his condition and appearance was that of a man younger in years. That he was not contemplating death is shown by the fact that when the first gift in question was made, he was courting a woman in her forties, whom he married seven months later, and they removed to another state and acquired a new home there. Instead of preparing to die, he was preparing to live, and he and his new wife did reside in their new home in Florida some seven and a half years before his death occurred. In January 1939, about three months prior to the third and last gift in question, decedent increased by $100,000 his investment in Thomson & McKinnon. Instead of contracting his business at this time, he was expanding same. The stroke which he suffered in 1942 was some three years subsequent to the last gift in question. The making *159 of gifts by the decedent, especially to his children, was never an unusual act upon his part. His son and daughter were recipients of frequent gifts from him in large amounts. Prior to his son's death in 1934, he had given him an aggregate sum of more than $150,000, and contributions to his daughter up to that time were almost as much. After his son's death, he concentrated gifts upon his daughter who was, as one of the witnesses expressed it, the apple of his eye, and after her marriage he continued to give generously to her support and that of her husband and children. Without pointing out in detail the evidence, we think it supports our finding that the reasons prompting him to make the three gifts in question were: (1) To assure his daughter and her family a scale of living which he desired them to maintain during his own lifetime; (2) to reduce his own income taxes; and (3) to secure his daughter's income from the risks of his own market speculations. Respondent's determination that the decedent made these gifts in contemplation of death is reversed. Since petitioner concedes that other adjustments made by the Commissioner in his deficiency notice are correct, and there is *160 yet to be ascertained the administration expenses and attorney's fees under the agreement of parties, Decision will be entered under Rule 50.